All right. We'll turn then to the next case. This morning we had somebody in D.C. got caught in a blizzard. Their flights got canceled. You know all of that stuff. It's worse than Uber, stock traffic lights. But in any event, it's up we have to hear the last argument on the TV screen. So this argument, however, is Lee v. Tucker in this case, 17-12-36. Mr. Dunaway, thank you for your patience. We're ready to hear you. Thank you and good morning, Your Honors. And yes, I would like to reserve two minutes for rebuttal. As I stated, my name is Kelly Dunaway. I'm representing the deputy defendants from Douglas County. That is to say all of the defendants, the appellants in this case. And personally, I've been representing this law enforcement agency going on 18 years now. And I have to say that in the post-Ferguson era, representing cops isn't as fun as it used to be. Now fortunately, as the lawsuits continue to increase, I don't know if it's coincidental or not, but qualified immunity is getting a lot of play at the Supreme Court. And I'm sure we're going to want to talk about those cases a lot. But if you'll indulge me a minute, I'd like to go back to one of this case, I'm sorry, one of this Court's prior decisions, a 2004 decision, Jerome v. City of Lakewood. It's 392 effort 410. It's in my brief. But in that case, in 1998, a Lakewood City police officer got a call from dispatch that there were two drunken girls in front of an apartment and they had stolen a purse. So she goes to the scene and confronts one of these young girls, 15-year-old Jessica Jerome. Once Jessica realizes that she's in trouble, she turns around from the bottom of the outside of the stairs and goes upstairs to her sister's apartment. Of course, the officer follows her in the door. But Jessica runs through the kitchen, grabs a knife, goes to the back bedroom. The officer follows her in, tries to get her to come out. There's a lot of back and forth, but eventually Jessica waves the knife. She doesn't threaten, she's not charging her, at least according to summary judgment, so you're going with what the plaintiff will admit. But essentially, after much back and forth, the officer pulls the gun and shoots her. Of course, she was charged with excessive force, and this court ruled that the use of force was objectively reasonable because, and they're quoting from Corsace v. Cassier, the court found that if an officer reasonably believes, even if it's mistaken, that a suspect will fight back, then the officer would be justified in using more force than might actually be necessary under the circumstances. Now, we can debate that and how it applies to this, but if you'll indulge me a second, I'd like to back up on those facts and rewrite it a little bit. Let's just say that you are Let's just talk about this case first, before we go to the hypotheticals. I think the problem is if you start with hypotheticals, it really gets harder to focus in on the facts of this case. In this case, I think the whole world would have a lot of sympathy and has a lot of sympathy with police officers having to go into strange situations, domestic disputes, not only a domestic dispute, but a nasty domestic dispute where maybe one, maybe both of the things being thrown, people being pushed, it's a nasty scene. A lot of sympathy for those officers going in and basically protecting society. The question here is whether the officers went too far, and I think that would really help us, I think, if you would focus in on that microcosm of time, following the point at which nasty words are being spoken and curse words. I mean, you could sympathize with what these officers had to put up with. But now there's been cursing and throwing and pushing and the officers, now at the scene there are what, four officers at the pivotal point now? Correct. There are four officers. Four officers seeking to restrain somebody who's drunk. Is that a fair summary? Yes, except... So far, or not drunk? Drunk, yes. Okay. But it wasn't four people restraining. It was actually... So it was two people restraining, right? One person putting the lock on? It was one person initially and then two coming to the assistance while the fourth stood with the wife. So originally it was one-on-one because two of the deputies... Did you know anything about the physical size of the husband? Yes, he was about six foot tall. Six foot tall and around 200 pounds. Age? Age was, I believe, thirties low to mid. Stood strong person still? Yes. Okay. Not approaching the age in geriatric conditions. No. Okay. All right. So that frames the picture. Now you tell us your version of what happened. I'm going to jump in. Sorry. He didn't get to talk. I have kind of a preliminary question. I want to confirm what I see as your argument in the brief, particularly in your reply brief, is that what kind of justified, in your view, the initial... I'm trying to think of the officer, Tucker, that runs in the kitchen and jumps in first, is that Officer Tucker gave him an order and he refused to comply with the order. That is correct. Right. And that seems to be... I mean, you've got to have some reason why he's able to go after him at all, because he's in his own home and it's a consensual encounter, presumably. And you're saying he disobeyed an order. Correct. And so that justified him even starting this whole... Brouhaha. Brouhaha that ensued. But that position, to me, assumes facts that are completely contrary to the facts that the district court found. The district court made some very specific findings, and in particular, about whether he was free to wander around, whether he was detained. And she said the parties dispute, and she listed three things, Mr. Lee actually, whether he announced his intention to get a glass of water, whether he was aware that he was being arrested or detained and could not move freely about his residence. And here's the important part. She said it's disputed upon rising from the couch whether Defendant Tucker asked and slashed or ordered the plaintiff to stay seated and away from the kitchen. And then she later does, in her actual findings, the district court says both Defendants Tucker and O'Harald testified that Mr. Lee was not detained at the time he walked toward the kitchen, that the Defendant Tucker did not warn Mr. Lee not to go into the kitchen because of the knife, on and on. My point is you assume in all of your briefing that that order meant something, and that meant something because it was a seizure. And she very clearly found there was a question of fact about whether he was seized, and all of your officers, from what I could see, testified that's where she got that question of fact because they testified, yeah, it was a consensual encounter, and this particular officer even said, yeah, he wasn't seized, and if you're not seized, you're free to go. You're free to move around. So, I mean, I feel like we have a jurisdictional issue is my point to that long question because you're assuming some facts that the district court said were controverted. Yes, and in a sense it's parsing hairs over what was seized. Deputy Tucker, who was the one who made the initial seizure, was not the arresting officer. He was backup. He's a canine guy there for security, the dog's in the car. It was the other two that had gone outside who are investigating the crime and charging. I don't care that they're investigating the crime. I care about whether he was free to roam about his own home, and that's what the district court cared about, too. This officer and the officer, there's a question of fact about whether they were going to arrest him, what they had decided. That's a question of fact, too. She made those findings. I'm asking, your whole brief seems to be premised on the fact that he gave an order, Tucker gave an order, don't go into the kitchen, when she found, first of all, it was either a request or an order, and there's definitely facts to say that, and she found it's, you know, not clear at all whether he was seized at that point or whether he was free to go into the kitchen. And I think the officers essentially confirmed that. And so I don't see how you can assume at this point that that order, he had to comply with that order, and that's the assumption you make in your brief. At the initial contact, he was not under arrest yet. It was rapidly emolgent. I'm talking about a seizure versus arrest. Right. But what I'm saying is that the district court also found, and this was undisputed, that Deputy Tucker had seen the knives in the kitchen and perceived them as a danger. Once someone's rapidly moving toward those knives and being uncooperative, it's no longer a matter of discussion. He had given an order and it was ignored. Right. If he did, the argument you specifically make in your brief is it changed from consensual counter to a seizure at the moment he gave an order. I'm saying whether he gave an order is totally controverted. And even by your own officer's question whether he gave an order or he requested it because he didn't think that the guy was seized. So I, you can, it may be that eventually these facts prove true and maybe it did turn into a seizure at that point, but there's a real question of fact about whether that order was an order or a request and whether he had to comply with it or whether the officer thought he had to comply with it. And so that's our jurisdictional problem now. If I'm a bad guy and you're a cop, and you see me reaching in here because you think I have a gun here, are you going to tell me you are now officially seized? Are you going to tell me you're under arrest? No, he doesn't have to tell me he's seized. Get your hand out of there. No, he doesn't have to tell him he's seized. I didn't say that. I don't think the district court said that either. Even your own officer vacillated all over the place about whether he ordered him or he requested and one of your other officers said he didn't order him either and that in fact it was a continuing consensual encounter. So what I'm saying is there's a question of fact about that. I'm not sure even that his, Mr. Lee's own awareness of whether he was detained is important. The trial court seemed to think it was. But your own officers vacillated about whether it was an order or a request and whether he was seized or not seized. So it's not something that we can assume now. Fair enough, but even if he had said nothing, he took action to prevent him from going to the knives because it was a danger that he perceived. If that danger, if that perception of danger is real, is reasonable, as the court tells us in Saussure, as this court reaffirmed in Jerome, the case I was talking about earlier, if you have somebody moving toward knives, if for example in Jerome they would have stopped Ms. Jerome before she grabbed the knife, it would have prevented the shooting. My point is the perception of the danger of the knives in the kitchen is eminently reasonable. We know that if somebody who is drunken, who is a criminal suspect, who is acting hostile gets to a place where they can get weapons, they could and the results might not be good. So even without any words at all, it is justified in trying to stop that person from doing it. You are low on time and I want to ask one question about clearly established law because all these cases eventually end up there. The magistrate relied on three cases, one of which came after this, so that's out. Casey being one and Kavanaugh being another. This case is a long way from Casey as far as the tasering goes. But here's my question. Because clearly established law is so difficult to surmount, what about this scenario? You have the melee in the kitchen. Three officers are subduing this man who apparently is resisting. The taser is deployed not once, not twice, I think three times and for a burst, knocking him out. What if a jury believed that they could have subdued him just fine and dandy without that taser, but instead used it because they're sick of dealing with drunk, abusive husbands and you want to disobey our orders, here's a taste of my taser. That would get past clearly established law, do you think, or not, and why not? I believe that it is not clearly established law. I believe the other case, there's Casey, which I believe you referred to as shocking facts in the Aldaba decision. Then there's Kavanaugh, in which case the deputies came up behind a woman who didn't even know that were there, was not hostile, was not given a chance to comply, as Mr. Lee was in this case, and shot her in the back. And she fell and hit her head and the court said, yeah, that's unreasonable use of force. Well, as Justice Gorsuch said when he was here, we'll spot you with one laser. How about the next two? Well, you understand it wasn't a shot. I didn't use a shot. I don't know who used the word shot. I didn't. But he gets one application of laser, then he gets a second, then he gets a third until he's unconscious. Do you get two free ones? No. Because even if you were justified one. If you use one and they're struggling and you're not shooting the prongs, you're just touching them with it, and they jerk away and you do a second and they jerk away, and by the time you get the third, you're close enough where you can hold them and take them to the ground, then yes, it is. And that's what happened here. We've demonstrated these questions that there's a lot of facts in this case that are in material dispute. Do you want to reserve a little time? Yes. We'll hear from you, counsel. Good morning, Your Honors. Raymond Bryant here for the plaintiff and appellee, Ryan Lee. We're here today, Your Honor, because defendants appealed an interlocutory order by the district court judge denying the assertion of qualified immunity. As this court has rightly pointed out, there are a lot of factual disputes, and defendant's brief relies almost entirely on factual argument to try to get this court to assume that qualified immunity is appropriate. That is not an appropriate question for an appellate court. The court should affirm the district court judge's opinion just on that basis. Well, don't we evaluate the case legally under the objective standard based on the facts that, in this case, magistrate judge found? Yes, Your Honor, but only against the clearly established law to determine whether the cases that came before it would govern the facts that are shown in the case. So we're on the right on-ramp. It sounds like here's the question. What are the clearly established cases that would make this obvious to any officer who's not incompetent or plainly set upon violating the law? This case would be... Casey? Yes, Your Honor. Is it Casey and Kavanaugh? Casey, Kavanaugh, Morris v. Noe, Fodor v. Gallegos, Dixon v. Richard. And which of those involve domestic or an arrest of a person who is belligerent and intoxicated? Well, belligerent and intoxicated are obviously disputed facts. Are they? Yes. Well, we know the cursing is not disputed. No, but cursing is not belligerent. And the wife had called 911 and reported about the drinking. The wife called 911 to ask the police to stop him from driving while drunk, not to do anything violent while drunk. Well, there had been a physical altercation where she had been pinned to the floor and bitten him. Obviously, appellants misconstrued that because they wanted it to sound like a violent encounter, but it really wasn't. If you look at the facts of the case, there's no injuries here. There's no allegations of anyone striking one or another. What happened is they got into an argument verbally. My client tried to leave the house to go out and get an e-cigarette from his vehicle. The wife thought, oh, my God, he might go out and try to drive after he's been drinking. So she goes out and she blocks the door so that he can't get out. He's already got the keys. Then she grabs the keys from him, and they're really hand-grabbing over these keys. At some point, my client puts his foot against the door to get leverage to yank the keys out so he would continue to possess them, and then they fell to the floor. That's how they got on the floor. And all I care about is what the magistrate judge says happened. Fair enough, Your Honor. It's obviously a disputed interaction, but the defendant officers weren't there, so you have to rely on Mr. and Mrs. Lee's accounts for that. You're going to contest belligerent and obnoxious and intoxicated, that those aren't within the magistrate judge's findings? I'm going to dispute that there was any kind of threat posed by this man to these officers. The belligerence is obviously something that's a pejorative label applied by the officers because they want to make him sound dangerous. Well, the question I always ask or try to ask, and the terms I try to think of these in, is what should the officer have done? If I were the officer, what would I do? He gets up. We've had an unpleasant encounter so far. Let's minimally describe it. And he just gets up and strides toward the kitchen. What should I do? Just sit in my chair and hope that he doesn't get a knife? No, Your Honor. The appellants present a false dichotomy of whether they only had two choices, right? This is not a situation where somebody had to either use violence or sit back and wait to see what happens. This is a situation where the defendant officers, specifically Tucker, had a myriad of options that were nonviolent, right? What's the first thing an officer typically does do if they see potential danger? They usually pull out their weapon and then issue commands, right? Stop, freeze. You know, this officer could have easily pulled out his taser if he really genuinely thought that a threat was imminent. But there are a myriad of facts that suggest there was no imminent threat. Even if the officer thinks, oh, my gosh, there's knives ten feet away, this man might be going in there to get a knife, you have to wait to see if he gets the knife before you can present an imminent threat. Well, it took three officers to subdue him and handcuff him, didn't it? These officers beat my client. There's plenty of evidence in the record to demonstrate that they weren't just trying to subdue him. Mr. Lee never – it's stipulated that Mr. Lee never was aggressive towards these officers, never tried to harm them, kick them, strike them, never tried to threaten them, even as he's being beaten. The defendant officers admit it. I don't understand, I guess, either the questions, the thrust of the questions or the answers. What difference does it make? I thought the allegation of your complaint, that the material dispute was centered over the use of the taser, whether even assuming that the jury found all these other facts in the light most favorable to the position of the officers and following the thrust of Judge Phillips' questions. I understood that this case was about the cases that warn against the improper use of tasers and that the situation here was that even if you get to the point where the officer is holding your client down, that they went too far in the use of the taser to the point of injury. Isn't that the thrust of the case, or am I missing something? It's twofold, Your Honor. It's about whether they had justification to apply any force at all. And those are the thrusts of Judge Morris. Yes. And then the second question is, of course, the extent of the force used. But the extent of the force used is not just three times by a taser, right? It's four close-fisted strikes by the other two officers who jumped in, also who did not give any warning or explanation before applying force. And, of course, Defendant Tucker, who began the use of force by tackling him, ramming him into the cabinets, and then tasering him three. It's not just three times. It's three pulls of the trigger for a total duration of 16 seconds within a 25-second span, which already should suggest that they didn't give any opportunity for Mr. Lee to comply with any possible commands. They're just tasering him because they want to punish him. There are plenty of facts just like that that suggest the officer's intent was to punish, not to, you know, get to any sort of law enforcement purpose. Did the magistrate say that? No. The magistrate obviously just recognized they were disputed facts. Well, the thrust of my questions is go to what are we doing, we're looking at what an objective, reasonable officer would do, and then overlaying what happened here with whatever case you have that is supposed to show that it's clearly established. That's why I'm asking you the questions. And what I have to say about those clearly established cases, Casey, Morris, Kavanaugh, Fogarty, all involve circumstances where an officer does not warn or explain his actions, where he simply leaps to the use of force in a surprise manner. That's exactly what happened here. Mr. Lee's back was to Defendant Tucker. Tucker jumped on his back, rammed him into the cabinets, and then, of course, the rest of the force ensued. Mr. Lee, during that entire encounter, didn't have control over his body. He's being thrown around between the cabinets, between the refrigerator. He wasn't doing anything consciously. So the idea that they were just trying to subdue him or they were just trying to, I guess, hold him or arrest him is ridiculous. But to your point, the cases apply precisely because this is a non-aggressive, suspected misdemeanant who's had a force applied to him without warning or communication, right? You have to warn somebody before you use force, right? Even if you give credit to Defendant's assertion that there may have been an order, and, of course, we're arguing it was not an order, it was very explicitly a request, then that should have some warning implicit in it, right? That should have some suggestion that the officer might use force if there's not compliance. But that's not part of it, right? Defendant Tucker let to the use of force because the earlier encounter my client used profanity, and he wanted to get back at him. And this is how these officers get their version of street justice, is they beat them. They use a taser more than three times, 16 seconds, within a 25-second span. They use close-fisted strikes four times on him. They batter them between the cabinets so they don't know what's up and what's down. That's what happens in these kinds of cases. The defendants have conceded there's no aggressive movements. There's no possible justification. The only thing they rely on is this alleged possible, you know, future threat that there's knives. But there's knives in every American household. There are utensils used for cooking. Well, if he was seized, if he had been given an order, and the order was stay put, you're under investigation, sit down, if that was the order, and he violated that order, why couldn't they assume that he was, they absolutely could tackle him if he violated that order and tried to walk off into the kitchen, regardless of whether they said there's knives in there. The question to me is, what was the circumstance? These officers, apparently several of them testified, he was free to go. He was, he wasn't detained. Which, and then there's some inconsistent testimony. And that's my point is, I, we are, we're stuck with the facts as the district court found them. The district court said it's controverted whether he was free to get up and walk around his own home and go into his own kitchen. And it's controverted, the district court said, whether the officer requested and said, the officer even said he said please. Or whether he ordered him, because he also said at one point he ordered him. So, I mean, these are all controverted facts. And I'm kind of surprised you're not arguing that we lack jurisdiction to hear this. Well, obviously I do argue that you lack jurisdiction, of course. In fact, this court just recently in Ralston v. Cannon admonished practitioners for raising appeals in 1983 cases where they were primarily just about disputed facts. And I think no matter how much the defendant's appellants argue that there was a danger or that there was an order, these are disputed facts. So the court does lack jurisdiction. But on the other side of that, I know that the court may want to hear the substance of the case. So I want to get away from that so you understand that this is not a circumstance where Mr. Lee, however drunk or belligerent you think he may have been, in cursing at the officers, never was aggressive to the officers in any way, shape, or form. You see that on page 5 of the appellant's reply brief. They admit that he was never aggressive, that he never threatened the deputies. He was in a consensual encounter, which just makes the officer's use of force without any warning doubly wrong, right? It's not a situation where they told him, hey, if you go in the kitchen, I might have to tase you or I'll have to use force or I'll have to take action in any way, shape, or form. It completely lacks that warning. And that's what this case has said. The case is wrong in Casey, Morris, Kavanaugh, and Fogarty. You can't just jump to the use of force. You have to give a reasonable warning to demonstrate that you are issuing a command that must be followed. How far was it from the living room couch to the kitchen? The living room couch to the kitchen is three to four steps. That's what the record shows. And all of this is supposed to happen in three or four steps? Yes. Well, all of this, I don't understand what you mean by that. You say warnings and so forth. Let me ask it to you this way. What should the police have done? The police officer, if he really felt like he may have been threatened, it's not a reasonable threat the way the facts are situated. But if he thought maybe a threat might materialize, then he watches him to see if he grabs a weapon or if he comes towards him, right? If he's really threatened, he can pull out a taser just in case, right? Because the distance between the threshold of the kitchen and the knives, which are on the other side of the kitchen, is somewhere around ten feet, right? So we've got three to four steps to the threshold of the kitchen, but then another ten feet that Mr. Lee would have to go to, grab a knife, brandish the knife, threaten the officer with the knife, and then approach the officer another ten feet back, right? You have to wait for some sort of imminence here, right? The officer is purely speculating that Mr. Lee might go to the other side of the kitchen and get a knife. And remember that the kitchen sink, which is really where he was going to get a drink of water, was right across the threshold of the kitchen. It wasn't anywhere near the knives. So this crazy idea that the officer should have acted right then or else all hell was going to break loose, pardon my French, was preposterous. I mean, you have to wait for some semblance of a threat before you can argue it was imminent. Otherwise, you eviscerate the second gram factor in the analysis. So I just have a real problem with them arguing that there was any kind of imminence. And if you ask what the officer should have done, he should have waited for any facts to suggest there might be a threat and that any threat would be imminent. And he waited for neither of those things. He didn't even warn Mr. Lee that he believed that, you know, the knives on the counter might be a threat or might be perceived as a threat, which just makes the surprise force even worse. Mr. Lee had no idea this was coming. It came from behind his back, right? The only thing Mr. Lee knew was that they had an unfriendly encounter where there was, you know, some mockery going on by Defendant Tucker and by Mr. Lee in retort. And then Tucker's alone with him and that Tucker didn't want him to go in the kitchen. And so he's thinking in his mind, of course, this is a consensual encounter. I've never been told I'm being detained. This is the kind of person who wants to assert his rights. And, you know, the Supreme Court and the Tenth Circuit has repeatedly held that it is incumbent upon a person in a consensual encounter to assert his right to walk away, to ignore a request. So the idea that you would punish Mr. Lee for doing exactly what this court and the Supreme Court have said he has a right to do is really problematic. What you should do is hold the officer responsible for reasonable commands during a police encounter, particularly when you change. Thank you. Thank you. Your time has expired. We're ready to hear you. You have 49 seconds. Yes, I know my time is short. I would like to touch on a couple of things. Judge Phillips, to your question about what they should have done, the response was they should wait and see if he gets the knife. My position is that's unreasonable. That was my point of Jerome. If you wait to see if he gets the knife and he gets the knife, they do something stupid and somebody gets shot. That's what Jerome taught. To your question about disputed facts, yes, there may be some. I don't think they're dispositive because at the end of the day, we have to do the qualified immunity analysis. The Court didn't even make any reference to Mullenix, made one passing reference to Polly, went with some old school qualified immunity laws. I submitted in my 28-J letter in January the most recent authority, which is this case's decision in the Ronquillo case, where they quoted the U.S. Supreme Court in the Ziegler case as saying it's not just now beyond doubt. Thank you. Beyond debate. Your time has expired. We appreciate the vigor of counsel in the presentation of the case. You're excused and the case is submitted.